**ORDERED.**

**Dated:  June 18, 2026**

Jason A. Burgess
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

In re:

Augusto Sanders Valencia,                                    Case No. 3:24-bk-03966-BAJ
                                                             Chapter 7
      Debtor.

_____/

Brixmor/IA Regency Parks SC, LLC,

      Plaintiff,

v.                                                           Adv. No. 3:25-ap-00047-BAJ

Augusto Sanders Valencia,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Proceeding came before the Court for trial on February 18, 2026 (the "Trial"), on the Complaint brought by Brixmor/IA Regency Parks SC, LLC ("Plaintiff") against Augusto Sanders Valencia ("Debtor").  By this Proceeding, Plaintiff objects to Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4) and Fed. R. Bankr. P. 4004 and 7001.  Upon consideration of the testimony, evidence, and respective arguments of counsel, the Court finds that Debtor, who suffers from serious medical issues, did not make *material* inconsistent statements or omissions that warrant a

denial of his discharge under § 727(a)(4).[1]  Accordingly, for the reasons set forth herein, the Court

finds in favor of the Debtor.

## Findings of Fact[2]

On December 31, 2024, Debtor filed a voluntary petition under Chapter 7 of the United

States Bankruptcy Code.  Debtor, who is self employed as a hairdresser, has a myriad of serious

health issues including neurological deficits arising from a previous stroke.[3]  Debtor's health issues

were collaborated by medical reports, as well as testimony from Debtor's stepmother, Aurora

Valencia ("Mrs. Valencia"), who stated that his medical issues have affected his ability to

remember things and to properly run a business.[4]

In August of 2024, Debtor started JLS Salon & More, LLC ("JLS").  Debtor was the sole

member of JLS and entered a sixty-two-month commercial lease (the "JLS Lease") for the

premises to operate a beauty salon.[5]  Debtor personally guaranteed the JLS Lease but was unable

to financially or physically open the space he rented under JLS.  At the Trial, Debtor testified that

JLS is not an active corporation in the state of Florida.[6]

Approximately two months later, Mrs. Valencia filed Articles of Incorporation for

Expression Salon & More, LLC ("Expressions"). Although Debtor was never listed as an officer,

member or manager of Expressions, he manages the day-to-day operations of the salon. Mrs.

---

[1] As the Court noted at the conclusion of the Trial, counsel for both parties did a very good job in presenting their respective cases, and the Court appreciates the professionalism exhibited.

[2] The Court incorporates by reference the Joint Stipulation of Undisputed Facts filed by the parties. (Doc. 27).

[3] Tr. pgs. 92-96; Debtor's Ex. 7, pgs. 119, 146.

[4] Tr. pgs. 72-74.

[5] JLS was located at 4131 University Blvd., Building 5, Jacksonville, Fl.  The term of the lease was from September 15, 2024, to November 15, 2029.  (Doc. 27, p. 2).

[6] Tr. p. 98.

Valencia testified[7] that she provided the funding to open Expressions, and that Debtor's father provided the labor and materials.[8]  Debtor testified that as of December 31, 2024, he considered himself to be operating his hairdressing business under Expressions.[9]

On Debtor's Schedule A/B, Debtor disclosed a CashApp account with a balance of $90.00 and two checking accounts with zero-dollar balances.[10]  On Schedule I, Debtor lists gross monthly income of $4,000.00 and net monthly income of $2,000.00.[11]  As listed on the Statement of Financial Affairs (SOFA), Debtor earned gross income in 2023 of $18,450.00, and gross income in 2024 of $36,000.00.[12]

On January 31, 2025, the Chapter 7 Trustee, Gregory K. Crews ("Trustee"), held and concluded the Section 341 Meeting of Creditors (the "Meeting of Creditors").  The Trustee also filed a report of no distribution which shows that no assets were recovered on behalf of the estate.

In May of 2025, Plaintiff initiated this Proceeding by filing a complaint (the "Complaint") objecting to Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4).[13]  The parties' dispute arises from a commercial lease agreement Debtor entered with Plaintiff, for the purpose of utilizing the space to operate a hair salon.  Debtor defaulted on the lease agreement, and Plaintiff filed a suit against Debtor in April of 2018 in the Circuit Court in and for Duval County, Florida (the "State

---

[7] The Court commends the genuine and forthright testimony given by Mrs. Valencia, who was kind enough to appear in court on her birthday to be a witness.  Debtor clearly has extremely supportive family members who have offered assistance through his health struggles to help him stay afloat in his hairdressing business.

[8] Tr. pgs. 68-71, 98.

[9] Tr. p. 98.

[10] The checking accounts listed were for TD Bank and Wells Fargo.  (Doc. 1, pg. 12).

[11] Doc. 1, pgs. 59-60.

[12] Doc. 1, p. 69.

[13] Adv. Doc. 1.

Court Action").[14]  The State Court Action complaint included one count for possession and one count for breach of contract.[15]  Plaintiff prevailed in the State Court Action, obtaining both a default final judgment for possession,[16] and a monetary final judgment dated March 28, 2019 in the amount of $119,455.89 (the "Final Judgment").[17]  For approximately four years, the State Court Action sat idle until October of 2024 when Plaintiff renewed its post-judgment collection efforts, which subsequently led to Debtor filing for protection under the Bankruptcy Code.

As grounds for the Complaint, Plaintiff alleges that Debtor failed to disclose the following in his Schedules and SOFA: (i) several bank accounts, (ii) his interest as sole owner in JLS Salon & More, LLC, (iii) his interests and obligation under the JLS Lease, and (iv) all his income. Plaintiff also alleges that Debtor's testimony at the Meeting of Creditors was false as it pertained to the nature of his business as a hairdresser, and the hairdressing businesses in which he holds an interest.  The Joint Stipulation of Facts sets forth some of the various inconsistencies alleged by Plaintiff.

In response to the allegations, Debtor states that a few days after the Meeting of Creditors he filed an Amended Petition and an Amended SOFA.  In the Amended SOFA, Debtor disclosed that he has owned JLS since 2024.  Debtor also filed an Amended Statement of Monthly Income, which lists his average gross monthly income as $5,103.41, and his average net monthly income as $2,853.41.[18]  In April of 2025, Debtor filed a Second Amended Property Schedule in which he disclosed a 100% ownership interest in JLS, with a value of $0.00.

---

[14] State Court Action Doc. 2.  The State Court Action is styled: *Brixmor/IA Regency Parks SC, LLC v. Augusto S. Valencia*, Case No. 16-2018-CA-2090.

[15] Id.

[16] Id. at State Court Action Doc. 22.

[17] Id. at State Court Action Doc. 29.

[18] Debtor also filed an Amended Summary of Assets/Liabilities listing his monthly income as $2,000.00.

Also in April of 2025, Debtor filed an Amended Schedule A/B in which he disclosed an additional checking account with Chase Bank (the "Chase Bank Account"), with a balance of $1,223.30.[19]  Debtor testified at the Trial that the Chase Bank Account was not initially listed on his Chapter 7 petition because he forgets things due to the stroke he suffered, and he was heavily medicated at the time.  At the 2004 Examination, Debtor testified that he pays for his personal expenses from the Chase Bank Account, and that the cash deposits and Zelle deposits in that bank account are from his hairdressing clients. Debtor also testified that total monthly deposits exceeding $3,000.00 in the Chase Bank Account are attributable to "favors [he] bequests others that don't have the ability to open their own bank account," and that he makes payments and purchases on their behalf because "they lack a credit card to their name."[20] (Tr. p. 96).  Debtor further explained that this is why the Chase Bank Account has a $0.00 balance at the end of every month.

Debtor also maintains that JLS, as set forth in the JLS Lease, was the tenant under the agreement and that his sole connection to the lease is his personal guaranty of the obligation.[21] Accordingly, Debtor argues that he was not required to list the lease on Schedule G.

### Conclusions of Law

"In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets."[22] "The Bankruptcy Code favors discharge of the honest debtor's debts and provisions

---

[19] The Chase Bank Account has an account number ending in 3142.  Debtor previously had three other bank accounts at Chase Bank but those accounts were closed between May of 2024 and December of 2024.  (Doc. 27, pgs. 6-7).

[20] Debtor also testified that his friends sometimes wire him money when he is in need.  (Tr. p. 96).  Additionally, Debtor explained that his father sometimes gives him money to deposit into his account so that he can make his father's car payment on his behalf. (Tr. p. 97).

[21] Plaintiff's Ex. 26.

[22] Schultz v. U.S., 529 F.3d 343, 346 (6th Cir. 2008).

denying a debtor's discharge are construed liberally in favor of the debtor and strictly against the creditor."[23] The right to a bankruptcy discharge though is not limitless.[24] "Section 727 ... provides that a debtor shall be granted a discharge unless one or more of twelve enumerated reasons to deny the discharge exists."[25] Plaintiff seeks to have the Court deny Debtor's discharge pursuant to 11 U.S.C. §727(a)(4).

Section 727(a)(4)(A) provides for denial of a debtor's discharge if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The First Circuit has stated:

> [T]he very purpose of...§ 727(a)(4)(A) is to [ensure] that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to ensure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction ... Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[26]

"A plaintiff objecting to a debtor's discharge under § 727(a)(4)(A) for an alleged false oath or account must establish by a preponderance of the evidence that the debtor is not entitled to a discharge."[27] Were courts to strictly construe 11 U.S.C. § 727(a)(4)(A), almost any omission from a Debtor's schedules or misstatement at the 341 Meeting could ostensibly be grounds for denial of discharge. Such a result would not align with the spirit and intent of the Bankruptcy Code. Instead, "[t]he Bankruptcy Code favors discharge of an honest debtor's obligations."[28] A court's reasons

---

[23] In re Allen, 553 B.R. 916, 922 (Bankr. M.D. Fla. 2016).

[24] Id.

[25] Menotte v. Hahn (In re Hahn), 362 B.R. 542, 546 (Bankr. S.D. Fla. 2007).

[26] Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987).

[27] Forbes v. Moore (In re Moore), 559 B.R. 243, 254 (Bankr. M.D. Fla. 2016) (citation omitted).

[28] In re Jennings, 533 F.3d 1333, 1338 (11th Cir. 2008).

for denying a discharge "must be real and substantial, not merely technical and conjectural."[29] "[T]he denial of a debtor's discharge is an 'extraordinary remedy' and an 'extreme penalty' to the debtor."[30]

A party seeking the denial of a discharge pursuant to § 727(a)(4)(A) must establish the following elements: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.[31]  A false oath may involve a false statement or omission.[32]  "There is a difference between a debtor who is trying to hide assets with a false oath or material omissions in his [schedules], and a debtor who, through inadvertence, mistake, or ignorance ... omits[s] certain assets."[33]  In determining whether a debtor has the requisite fraudulent intent, a court should analyze whether omissions or nondisclosures are "part of a scheme ... to retain assets for [the debtor's] own benefit at the expense of his creditors."[34]

In support of its argument under § 727(a)(4)(A), Plaintiff alleges that Debtor failed to disclose the following in his Schedules and SOFA: (i) several bank accounts, (ii) his interest as sole owner in JLS, (iii) his interests and obligation under the JLS Lease, and (iv) all his income. Plaintiff also alleges that Debtor's testimony at the Meeting of Creditors was false as it pertained to the nature of his business as a hairdresser, and the hairdressing businesses in which he holds an interest.

---

[29] Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994).

[30] Forbes v. Moore (In re Moore), 559 B.R. 243, 254 (Bankr. M.D. Fla. 2016).

[31] Shappell's Inc. v. Perry (In re Perry), 252 B.R. 541, 549 (Bankr. M.D. Fla. 2000).

[32] Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 62 (9th Cir. BAP 1999).

[33] In re Dupree, 336 B.R. 520, 527 (Bankr. M.D. Fla. 2005).

[34] Id.

Although Plaintiff did an admirable job with the set of facts it has, the Court does not find the facts and circumstances lead to the finding that Debtor acted with the requisite fraudulent intent. Debtor's medical records, along with the testimony by the Debtor and Mrs. Valencia support the conclusion that Debtor's serious medical issues have impacted his memory, rendering his errors and omissions unintentional. Specifically, Mrs. Valencia testified that after Debtor suffered the stroke that he was "not the same," and was "missing everything."[35] In response to being asked if Debtor's stroke has affected his ability to run a business and keep track of money, Mrs. Valencia responded:

> Junito does things that I - - what happened, Junito? Sometimes I need to talk to him. What happened to you? Why are you forgetting things? Why are you losing things? I know that you need help. I would like to be more with him, but I can't. His father is not in good condition either. He have a lot of issues, and I know that he's so worried because he's so worried about his son, and he's my son, and I need him. I need Junito in my life.[36]

Without fraudulent intent, these misstatements *cannot* form the basis for the denial of Debtor's discharge.[37]

Furthermore, the Court finds any inconsistent statements or omissions were not material. This finding is supported in part because the Trustee filed a report of no distribution. The Court finds this notable because a trustee's duties include, but are not limited to: collecting and reducing to money property of the estate, investigating the financial affairs of the debtor, opposing the debtor's discharge if advisable, furnishing information requested by parties in interest regarding the debtor's estate, and ensuring that the debtor's income does not exceed the means test or

---

[35] Tr. p. 72.

[36] Throughout the Trial, Mrs. Valencia referred to Debtor as "Junito."

[37] Id.

otherwise give rise to a presumption of abuse.[38]  Given these duties, the Court finds it relevant that the Trustee found no assets worthy of pursuit, including any prepetition transfers or any of Debtor's business interests.

In support of its position, Plaintiff focuses on the large inflows and outflows from Debtor's bank accounts as proof of the materiality of his omissions.[39]  The Court finds any omissions related to these transactions to be immaterial.  First, Debtor testified credibly that due to his poor health he is only able to service one to two clients per day.[40]  Further, Debtor explained that total monthly deposits exceeding $3,000.00 in the Chase Bank Account are attributable to "favors that [he] bequests others that don't have the ability to open their own bank account," and that he makes payments and purchases on their behalf because "they lack a credit card to their name."[41] Therefore, these transactions were largely pass-through transactions and not attributable to work performed by Debtor.  Second, even assuming without deciding that these transactions could be counted as Debtor's income, such prepetition income would not have impacted Debtor's eligibility for Chapter 7.  Debtor's debts are primarily business debts; therefore, the means test does *not* apply.[42]  Thus, any inconsistent statements regarding the bank accounts were not material and do not warrant denial of Debtor's discharge under 11 U.S.C. § 727(a)(4).[43]

While there is no need for the Court to dissect every other alleged falsehood or omission, Plaintiff's assertion that Debtor failed to disclose his "interest in and obligations under a

---

[38] 11 U.S.C. §§ 704(a)(1), (a)(4), (a)(6), and (b).

[39] Adv. Doc. 46, pgs. 4-5.

[40] Tr. at p. 95.

[41] Tr. at p. 96.

[42] In re Baird, 456 B.R. 112, 119 (Bankr. M.D. Fla. Jan. 20, 2010) (Creditor failed to establish threshold requirement of 11 U.S.C. § 707(b) proceeding because debts were primarily business debts).

[43] Gargula v. Wright (In re Wright), 618 B.R. 569, 578 (Bankr. M.D. Fla. July 13, 2020) (the court found that an immaterial omission that was an honest mistake was no reason to deny the debtor's discharge).

commercial lease"[44] is an example of how the allegations fail to warrant the relief sought. The Debtor was not the tenant under the JLS Lease. An affiliated company signed as the tenant.[45] Debtor's only connection to the JLS Lease is his personal guaranty of the obligation. Therefore, Debtor was not legally required to list the JLS Lease on Schedule G. Given the Debtor had no interest in the lease, it could be of no value to the estate. If the Trustee had deemed that there was value in Debtor's JLS Lease interest, the Trustee would have sought turnover of the lease, sold the estate's interest, or sought to assign the lease for the benefit of the estate.

Since the JLS Lease does not have material value to the estate, this negates any purported fraudulent intent. The Court therefore cannot reasonably ascertain what motive or financial gain would have incentivized Debtor to intentionally omit the JLS Lease guaranty from his schedules. If anything, this omission could prove harmful to Debtor if he ever defaults on the lease and the landlord obtains a money judgment against him. Given the lack of fraudulent intent, for which Plaintiff bears the burden of proof, the Court finds the denial of discharge based on this omission unwarranted.[46]

## Conclusion

The Bankruptcy Code is intended to protect the honest but unfortunate debtor. Life is not always kind, and at some point, hardships befall us all. Sadly, Debtor has experienced more than his share of tumultuous times. The Court listened intently to the testimony and documentary evidence presented at Trial, and despite the myriad of allegations, when boiled down to its essence, Debtor's bankruptcy case was deemed a no asset case by an experienced Chapter 7 Trustee, the JLS Lease has no ascertainable value, and Debtor made no *material* omissions. Based on the

---

[44] Adv. Doc. 46, p. 2.

[45] Plaintiff's Ex. 26.

[46] In re Moore, 559 B.R. at 254.

above, the Plaintiff did not meet its burden under § 727(a)(4), and the Court will enter a separate

judgment consistent with these Findings of Fact and Conclusions of Law in favor of Debtor.